RICHARDSON VISTA CORPORATION, a Washington corporation, and Panoramic View Corporation, a Washington corporation, Plaintiffs,

v.

CITY OF ANCHORAGE, a municipal corporation, Defendant.

No. A-7481.

District Court, Alaska
Third Division, Anchorage.

May 25, 1955.

John S. Hellenthal, and Ralph H. Cottis, Hellenthal, Hellenthal & Cottis, Anchorage, Alaska, for plaintiff Richardson Vista Corporation.

F. M. Reischling, Reischling & Chan, Seattle, Wash., Albert Maffei, Anchorage, Alaska, co-counsel, for plaintiff Panoramic View Corporation.

John L. Rader, Anchorage, Alaska, for defendant.

FOLTA, District Judge.

Plaintiffs, owners of housing projects comprising 19 and 14 apartment buildings respectively, on two unsubdivided tracts within the City of Anchorage, seek to recover approximately $40,000 in alleged overpayments for electricity supplied for such facilities and places in each building as are used exclusively by the plaintiffs or provided for the use of their tenants in common, and measured by a meter in each building. In the application of rates and in billing for the current consumed, the City treated each building as if it were separately owned. The plaintiffs contend that each housing project should be treated as a single customer, the meter readings combined, and the rate applicable to the total energy used, applied. The City contends that the installation and maintenance of a separate service drop and meter at each building warrant the classification made and points to the fact that all identical housing projects, as well as more than 200 multi-meter consumers within its corporate limits, are similarly dealt with.

Manifestly, if the City's position is untenable, the recovery of overcharges by all these consumers might well have disastrous consequences. The trial, which was to the Court, was somewhat protracted and marked by vehemence and indignation, affected or genuine, and the briefs, aggregating 135 pages, are of like tenor, but as I view the case, out of the welter of contentions only two ques-

tions emerge, (1) whether a housing project consisting of several buildings erected on one tract of land and owned by one person is an ".establishment" within the meaning of Schedule (C) of the City's rate tariffs, and (2) if so, whether the practice of the City in refusing to combine meter readings is in conflict with the schedule.

It appears that before these housing projects had been completed in 1951, the plaintiffs discussed the matter of rates with some of the officials of the City with the view of obtaining the benefit of conjunctive billing. Apparently all the parties thought ordinance No. 55 was still in effect. It provided that "in no event would separate premises, even though owned by the same consumer, be supplied with electricity through the same meter or meters" and expressly prohibited combined meter readings "except where the City, for its own convenience, installed more than one meter." The sections containing these provisions had, however, been repealed on August 24, 1949, by ordinance No. 283, without a reenactment of these provisions. Sec. 602.1 of that ordinance empowers the City Manager to make and publish rates and charges for electrical energy and service, and Sec. 608.1 provided that

"The City Manager, with the approval of the City Council, may adopt and promulgate such rules and regulations as may be necessary pertaining to the supplying and discontinuance of electric service to all consumers, including but not being limited to rates, charges for connecting and disconnecting service, separate meters for separate premises * * *"

Effective January 1, 1951, the City promulgated rate tariffs, the following schedule of which is applicable to this controversy:

"Schedule (C) Commercial Rate

"This service applicable to single phase service for lighting, cooking, small appliances and incidental single phase motors not in excess of five (5) horsepower, in professional, mercantile, industrial and other establishments not classed as single family residences.

| | |
|---|---|
| First 25 KWHrs | 10¢ |
| Next 50 KWHrs | 8¢ |
| Next 50 KWHrs | 7¢ |
| Next 1000 KWHrs | 6¢ |
| Next 1000 KWHrs | 5¢ |
| Excess KWHrs | 4¢" |

It was in this setting that the plaintiffs presented their demand for conjunctive billing to the City Council. Although it may be inferred from the testimony that the repeal of the provisions of ordinance No. 55 was inadvertent and that the City Council and officials were ignorant thereof, the reason stated in the minutes of the meeting of the City Council of November 9, 1951, defendant's Exhibit K, at which the plaintiffs' demand was denied, that to grant the demand "would alter the established policy of billing for each individual building and would also affect many others who own more than one building and are billed on a separate unit basis" would appear to indicate knowledge of the repeal. Thereafter the plaintiffs paid their bills under protest, according to Schedule (C), which survived successive revisions until the sweeping revision of January 2, 1955.

 It is conceded that after ordinance No. 283 became effective no rule or regulation was adopted prohibiting conjunctive billing and plaintiffs argue that in the absence of such a rule or regulation the practice referred to was unauthorized because of Sec. 49–1–3 of the A.C.L.A.1949, governing public utilities generally. I am of the opinion, however, that the language of that section clearly shows that it was not intended to apply to municipalities.

Since it can hardly be disputed that the plaintiffs' housing projects are "establishments" within the meaning of Schedule (C), the crucial questions are (1) whether the refusal of the City Council to grant the request for combining meter readings is equivalent to an authorization or ratification of the practice

referred to, and, (2) if so, whether the practice conflicts with Schedule (C). Since the language of Sec. 602.1 of ordinance No. 283 is merely permissive and the Court has already held that Sec. 49-1-3 of the A.C.L.A.1949, does not apply, it follows that the City was not required to make such a practice the subject of a rule or regulation. However, Schedule (C) necessarily implies that an "establishment" is entitled to the benefits of the sliding scale of rates, whereas the construction placed upon this schedule by the City is that such an "establishment" is entitled to this benefit only if the service is of the 1-point variety. While this classification could hardly be said to be unreasonable, and therefore invalid, yet, since it effectually excluded any establishment consisting of more than one building from the benefits of lower rates for increased consumption, I am of the opinion that it was in conflict with Schedule (C) except where multiple meters were installed at the request of the consumer.

Judgment may be presented in accordance herewith.